**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETH KOLBRAK, individually and on behalf of all others similarly situated, | Case No. 26-3681 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AMETHYST AMELIA KELLY p/k/a IGGY AZALEA, and DOES 1 THROUGH 50, | |
| Defendants. | |

1

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 3 |
| II. | PARTIES | 7 |
| III. | JURISDICTION AND VENUE | 10 |
| IV. | FACTUAL ALLEGATIONS | 13 |
| V. | CLASS ALLEGATIONS | 34 |
| VI. | CLAIMS FOR RELIEF | 36 |
| VII. | PRAYER FOR RELIEF | 42 |
| VIII. | JURY DEMAND | 43 |

# I. PRELIMINARY STATEMENT

1.    This case is not about ordinary volatility in a cryptocurrency. It is not about the inherent risk that a speculative digital asset may decline in value.

2.    This case is about a celebrity-led promotional campaign that induced consumers to purchase and hold a digital token through specific, material representations about real-world utility, commercial integrations, institutional market maker support, and continuing development.

3.    MOTHER is not pleaded in this Complaint as a security. Plaintiff's claims arise under consumer-protection and common-law principles applicable to the deceptive marketing of a consumer-facing digital financial product. A digital asset need not be a security for its promoter to be liable for materially misleading representations about its utility, access rights, payment functionality, commercial integrations, market support, and demand-generating features.

4.    Those representations were limited, incomplete, contradicted, temporary, or not delivered in a durable way. The terms and effects of the market support arrangements were never disclosed to consumers.

5.    Defendant Amethyst Amelia Kelly, professionally known as Iggy Azalea, launched the $MOTHER token on the Solana blockchain on or about May 28, 2024. The Token was not promoted as a passive speculative instrument.

6.    Instead, it was promoted as the native currency of an expanding ecosystem of real businesses controlled or co-founded by Azalea, including a telecommunications company, an online casino, a luxury gifting marketplace, a merchandise store, and entertainment integrations.

7.    That ecosystem was also promoted as benefiting from a professionally managed trading environment supported by two of the cryptocurrency industry's most prominent market-making firms, Wintermute Trading Ltd. and DWF Labs.

8. Holders of MOTHER received no equity in Azalea's businesses. They received no revenue-sharing rights, no voting power, no contractual claims, and no legal interest in any underlying enterprise.

9. The only way MOTHER could have value was if other people wanted to buy it. The only reason other people would want to buy it was if the promised utility, integrations, and commercial demand materialized.

10. Defendants' promotional campaign was designed to create the belief that those value drivers were real, expanding, and supported by serious institutional partners.

11. Among the most striking examples was the MOTHERLAND casino. On September 12, 2024, Azalea posted on X: "I hope you held on to your $MOTHER / You'll need it to get into MOTHERLAND."

12. The @MOTHERprovides project account announced: "Excited to officially announce Motherland, a new online casino. Motherland is releasing in November and will be powered by $MOTHER."

13. These were direct purchase-and-hold inducements. They told consumers that possession of MOTHER would be necessary for access to a new commercial platform and that the casino would generate transactional demand.

14. When the MOTHERLAND casino launched in January 2025, $MOTHER did not function as the casino's operational settlement currency. Although MOTHER appears among accepted deposit options, the casino's wagering, bonus accounting, and settlement are denominated in USDT (Tether), not in $MOTHER. The core represented use case—a casino "powered by $MOTHER"—was eliminated. Token holders received no recurring transactional utility from the casino.

15. The market maker theory is equally significant. Azalea personally selected two professional crypto market makers——Wintermute and DWF Labs—and publicly announced those partnerships.

16. In her July 2024 Unchained Crypto interview, Azalea explained that she chose Wintermute so that exchanges considering listing $MOTHER would be reassured of the project's legitimacy by the involvement of a respected market maker.

17. She chose DWF Labs to penetrate the Asian market. She disclosed that she transferred her personal token inventory to both firms. These are not the acts of a passive celebrity endorser.

18. The DWF Labs partnership announcement alone caused the Token to surge over 50% in a single day. Consumers were never told the terms of those arrangements or the risks they created.

19. Azalea also deliberately used New York as part of the demand-generation and financial-credentialing campaign for MOTHER. She conducted MOTHER-related business in New York, publicly announced "$MOTHER IN NYC ALL WEEK," appeared at the New York Stock Exchange, invoked Wall Street imagery, posted "$MOTHER TAKES WALL ST," and used New York's financial-market credibility to validate MOTHER as a serious, utility-backed digital financial product. In the context of a decentralized token whose value depended on public market signaling and consumer demand, this New York conduct was part of the deceptive transaction architecture, not merely background promotional activity.

20. The Unreal Mobile integration was equally material. Azalea announced that consumers could "purchase phones, or month to month cell plans using $MOTHER" with savings of "up to $600 per year."

21. Phone plans are recurring monthly services. A token usable for phone bills suggests sustained, repeated transactional demand—the single most important distinction between a utility token and a joke asset.

22. As of the date of this Complaint, no durable, publicly observable MOTHER payment integration exists on the Unreal Mobile platform.

23. Within approximately two weeks of launch, MOTHER reached an all-time high market capitalization of approximately $200 million. It has since declined approximately 99.5%, to approximately $1 million.

24. Consumers who purchased or held MOTHER in reliance on the utility, integration, and market support narrative, suffered losses. Defendants and affiliated entities benefited from the promotional campaign.

25. Plaintiff brings this class action on behalf of all persons who purchased or otherwise acquired $MOTHER tokens for value during the Class Period and who suffered losses as a result of Defendants' conduct.

26. Plaintiff seeks damages and equitable relief under New York General Business Law Sections 349 and 350, and common law theories of negligent misrepresentation and unjust enrichment.

## II. PARTIES

**Plaintiff**

27.  Plaintiff Kenneth Kolbrak is an individual and a citizen of Wisconsin. During the Class Period, Plaintiff purchased $MOTHER tokens after being exposed to Azalea's public promotional statements concerning MOTHER's real-world utility, commercial integrations, market-maker support, and continuing development. Plaintiff suffered financial losses of several hundred dollars as a direct result of Defendants' conduct.

28.  Plaintiff was a member of the project-affiliated $MOTHER Telegram channel during the Class Period and was directly exposed to representations made there by the project team about MOTHER's utility, ongoing development, commercial integrations, and market-maker support. Plaintiff also viewed and relied on Azalea's public posts on X, in which she promoted MOTHER as the native currency of an expanding ecosystem of real businesses, announced commercial integrations (including Unreal Mobile, MOTHERLAND, and DreamVault), publicized her selection of professional market makers (Wintermute and DWF Labs), and presented MOTHER as authenticated by her real reputation, celebrity persona, and personal involvement. Plaintiff understood Azalea's X posts and the project team's Telegram statements to mean that MOTHER had demand-generating utility beyond ordinary speculative trading, including payment functionality through Unreal Mobile, casino access and functionality through MOTHERLAND, and institutional market support through professional market makers. Plaintiff would not have purchased MOTHER, or would not have purchased MOTHER at the prices paid, absent those representations.

29.  Plaintiff brings this action individually and on behalf of all similarly situated persons and entities.

**Defendants**

30.  Amethyst Amelia Kelly, professionally known as Iggy Azalea ("Azalea"), is an Australian-born rapper, songwriter, and entrepreneur. Upon information and belief, Azalea is domiciled in Los Angeles County, California.

7

31. Azalea was not merely a celebrity promoter of MOTHER. She was the Token's issuer and principal architect. She launched the $MOTHER token ("Token") on the Solana blockchain and served as the project's public face.

32. She promoted MOTHER to her more than 6 million followers on X (formerly Twitter) and owned or co-founded the businesses that formed the core of the Token's utility narrative.

33. Those businesses included a substantial ownership interest in Unreal Mobile and a casino that Azalea publicly stated she owned. She personally selected the project's market makers, Wintermute and DWF Labs.

34. In a public interview, she explained that she chose those firms to build exchange confidence and market credibility. She transferred her personal token inventory to both market makers.

35. She appeared at the New York Stock Exchange on June 12, 2024 to promote the Token and publicly predicted a $300 million market capitalization. She continued promotional activity through at least May 2025.

36. On May 29, 2024, Azalea publicly confirmed: "Own 25% of a telecommunication company." On September 20, 2024, she confirmed: "I like crypto and I own a casino." These admissions establish Azalea's financial interest in and control over the businesses at the core of the MOTHER utility narrative.

37. On June 10, 2024, Azalea posted on X: "$MOTHER IN NYC ALL WEEK" accompanied by a promotional image. On the same date, she posted: "Me & my team are actually in NYC meeting with some of the Solana team tonight in person."

38. On June 12, 2024, Azalea appeared at the New York Stock Exchange Opening Bell, met CNBC host Jim Cramer on the NYSE trading floor, and posted photographs captioned "$MOTHER TAKES WALL ST."

39. The promotional imagery accompanying that June 10, 2024 post displayed Azalea's personal image together with "TOO BIG TO FAIL" branding for the Token. The post tied

MOTHER directly to Azalea's New York presence and to the celebrity persona she used to authenticate the Token to retail consumers.

40. The "TOO BIG TO FAIL" branding is significant. MOTHER's market appeal was not based on technology, a whitepaper, or decentralized governance. Rather, it was based on Azalea's personal celebrity, image, and brand. Every promotional act reinforced the message that MOTHER was authenticated by and inseparable from Azalea herself.

41. Azalea's personal authentication was the foundation for the utility, integration, and market support representations that followed.

42. Doe Defendants are individuals and entities whose true names and capacities are presently unknown to Plaintiff. Doe Defendants participated in the launch, promotion, operation, development, market-making, token allocation, project-account management, wallet control, or monetization of MOTHER.

43. Doe Defendants include, without limitation, persons or entities responsible for operating project-affiliated accounts, including @MOTHERprovides; controlling deployer-connected wallets or insider allocations; receiving undisclosed token allocations or promotional compensation; structuring or participating in market-maker arrangements; and participating in the Unreal Mobile, DreamVault, MOTHERLAND, and other utility representations described herein.

44. Plaintiff will seek leave to amend this Complaint to identify Doe Defendants when their identities and roles are ascertained through discovery.

9

# III. JURISDICTION AND VENUE

## Subject Matter Jurisdiction

45. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(d)(2), the Class Action Fairness Act ("CAFA"). The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

46. The proposed Class consists of more than 100 members. At least one member of the proposed Class is a citizen of a different state than at least one Defendant. Members of the proposed Class include citizens or subjects of a foreign state.

## Personal Jurisdiction

47. This Court has personal jurisdiction over Defendant Azalea pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), incorporating New York's long-arm statute, N.Y. C.P.L.R. Section 302(a).

48. Azalea's New York activity was not incidental to the MOTHER project. It was a deliberate component of the Token's promotional campaign, directly tied to market capitalization, price, legitimacy, and consumer demand.

49. On June 10, 2024, Azalea posted on X: "$MOTHER IN NYC ALL WEEK." This was not a personal travel update. It was a promotional announcement tying the Token to a sustained period of New York business activity.

50. On the same date, Azalea posted: "Me & my team are actually in NYC meeting with some of the Solana team tonight in person." This confirms meetings with blockchain industry participants in New York in furtherance of the MOTHER project.



*Exhibit A: Azalea's X post, June 10, 2024. Azalea confirmed she and her team were in New York City meeting with members of the Solana blockchain team.*

51.    On June 12, 2024, Azalea appeared at the New York Stock Exchange Opening Bell. She met with CNBC host Jim Cramer on the NYSE trading floor. Cramer posted a photograph captioned "With Iggy Azalea, after opening bell!"

52.    Azalea posted photographs from the NYSE captioned "$MOTHER TAKES WALL ST." While physically present at the NYSE, she publicly predicted that MOTHER would reach a $300 million market capitalization.

53.    When asked whether MOTHER could reach a $300 million market capitalization by the end of the day, Azalea declared on camera: "Exactly, of course, I can!" This exchange was reported by Cryptopolitan, U.Today, and other media outlets.

54.    These New York activities were part of the same course of consumer-facing promotional conduct that induced retail demand for the Token. Azalea used the institutional credibility of the NYSE to promote MOTHER to consumers.

55.    The foregoing allegations establish that Azalea transacted business in New York within the meaning of C.P.L.R. Section 302(a)(1) and committed tortious acts in the state within the meaning of C.P.L.R. Section 302(a)(2) and (a)(3).

56. Azalea's New York conduct was not merely incidental promotional activity. It was part of the alleged deceptive transaction itself. MOTHER's value depended on consumer demand generated through public representations about utility, commercial integrations, market-maker support, and institutional legitimacy. Azalea used New York's financial-market institutions and Wall Street credibility to create that legitimacy, induce consumer demand, and encourage consumers to purchase or hold MOTHER.

57. This Court has personal jurisdiction over Doe Defendants to the extent discovery shows that they participated in, directed, aided, or benefited from the New York-centered promotional campaign, token allocation, market-making arrangements, or other conduct alleged herein.

**Venue**

58. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b).

59. A substantial part of the events giving rise to the claims occurred in this District, including Azalea's June 2024 MOTHER-related appearances at the New York Stock Exchange, her meetings with blockchain industry participants in New York City, her use of Wall Street imagery to promote MOTHER, and the New York-centered financial-market credentialing that formed part of the deceptive promotional campaign.

## IV. FACTUAL ALLEGATIONS

### A. Legitimacy Framing and Celebrity Authentication

60.     In markets for financial products, an issuer's or promoter's reputation and credibility are foundational to consumer confidence. A company that distinguishes itself from fraudulent peers and leverages a recognizable public figure to authenticate its offering, creates a heightened duty of accuracy in its representations.

61.     The same principle applies here. Azalea distinguished MOTHER from the wave of unauthorized celebrity tokens proliferating on Solana in mid-2024 and used her personal brand to signal that MOTHER was different, legitimate, authorized, and backed by someone with a real reputation at stake.

62.     For purchasers, that legitimacy framing was the threshold condition of the entire transaction. Without it, there was no reason to believe any subsequent utility or integration promise.

63.     The legal significance is direct. Each later representation about Unreal Mobile, MOTHERLAND, DreamVault, and market maker support derived its persuasive force from this initial authentication. It is the foundation for all four causes of action.

64.     MOTHER launched in May 2024 during a broader wave of celebrity associated memecoins on the Solana blockchain. Many celebrity tokens were criticized as short-lived pump-and-dump assets launched without authorization or utility.

65.     Before or around the launch of MOTHER, public controversies emerged involving unauthorized celebrity tokens, including a token branded "IGGY" reportedly associated with an individual named Sahil Arora.

66.     In her July 2024 Unchained Crypto interview, Azalea described her encounter with Arora as a formative event. She learned of an unauthorized token using her name and felt compelled to launch her own project to preempt exploitation.

13

67.  Azalea publicly distinguished MOTHER from unauthorized IGGY-branded token activity, framing MOTHER as the legitimate, authorized, and safer alternative.

68.  The @MOTHERprovides project account rejected the "celebrity coin" characterization, stating on June 1, 2024: "Going to have to say $MOTHER but we are not a CeLebRiTy cOIn we are actually building."

69.  Azalea publicly associated herself with MOTHER from the outset. Her personal brand, fame, image, and social media reach – having more than 6 million followers on X, were central to the Token's launch and market attention.

70.  MOTHER's initial identity was inseparable from Azalea's persona. The Token's name drew on internet slang for an iconic woman. The visual branding featured Azalea's image throughout the promotional campaign.

## B. Launch Structure and Insider Allocation

71.  In markets for digital financial products, misrepresentations about insider ownership, supply concentration, and affiliated-wallet control deprive consumers of information necessary to evaluate sell pressure, market fairness, and alignment of interests. The same informational harm applies here.

72.  If affiliated wallets controlled materially more supply than Azalea disclosed, purchasers were buying into what appeared to be organic demand but may have been providing exit liquidity for insiders.

73.  That informational asymmetry is actionable under GBL Section 349 and supports the negligent misrepresentation claim because only Defendants knew the true allocation.

74.  On or about May 28, 2024, Azalea launched the MOTHER token on the Solana blockchain via the Pump.Fun launchpad. The Token was subsequently listed on Raydium, Jupiter, and centralized exchanges including MEXC, Poloniex, BitMart, and LBank.

75.  On launch day, Azalea made direct statements regarding insider token allocation. She stated: "I have 3% lol" and "I literally only have 3% I'm holding on for dear life lolllllll"

76. She further stated: "I made a coin and tried to buy it, but then bots and other ppl did and I basically got nothing…"

77. She added: "Because me and my brother are new and when we launched it we only got 3% of the coin in 1 wallet. All the bots got it n it went to raydium basically in a second."

78. On-chain data from blockchain analytics platforms contradicts the impression created by these statements. Bubblemaps cluster analysis and Cointelegraph reporting revealed that approximately 20% or more of total supply was acquired by deployer-connected wallets.

79. A single wallet cluster received approximately 127.5 million tokens (12.75% of supply) from the deployer before public announcement. Combined pre-launch insider profits were estimated at approximately $2.0 to $2.2 million.

80. No formal tokenomics document, whitepaper, or official allocation table was ever published for $MOTHER. The Token had no published allocation, no vesting schedule, and no lock-up restrictions at launch or thereafter.

81. In digital-asset markets, the absence of any tokenomics disclosure, allocation table, vesting schedule, or lock-up information is material because consumers cannot evaluate insider supply, sell pressure, or whether apparent market demand is organic.

82. The complete absence of any tokenomics disclosure, combined with Azalea's affirmative misstatement about her 3% holdings, compounded the informational asymmetry between insiders and retail purchasers.

83. Consumers who purchased MOTHER in the days and weeks following the launch were making allocation decisions based on fundamentally incomplete and potentially misleading information about the Token's supply distribution and insider sell pressure.

## C. The Development Narrative and Why Utility Was Material

84. In markets for financial products, statements about product development, revenue pipelines, strategic partnerships, and commercial integrations directly affect consumer expectations about value and demand.

85.    MOTHER holders had no equity, revenue rights, or contractual claims on any enterprise. The Token's value depended entirely on expected future demand and expected demand depended on whether the promised use cases would materialize.

86.    For purchasers, every development representation went directly to the core question: is there a reason to buy or hold this token other than pure speculation?

87.    The legal significance is that each utility and integration representation was a material statement under GBL Sections 349 and 350 because it targeted the precise value driver——perceived demand—on which the Token's price depended.

88.    Beginning immediately after launch, the @MOTHERprovides account made a series of representations designed to communicate ongoing, substantive development activity.

89.    These included: "$MOTHER is building today" (@MOTHERprovides, May 30, 2024); "$MOTHER is building hard for the community" (@MOTHERprovides, June 1, 2024); "$MOTHER is building, providing & succeeding" (@MOTHERprovides, June 3, 2024); and "Our plans are way bigger than what anyone here is seeing or even thinking right now…" (@MOTHERprovides, June 5, 2024). Azalea also posted from her personal @IGGYAZALEA account on May 31, 2024: "Just hired a boat load of devs / For $MOTHER so we can get to work fr. Website incoming etc."

90.    None of these statements were accompanied by a technical roadmap, development update, testnet deployment, GitHub commit, product specification, or any other verifiable indicator of development activity.

91.    These statements created the impression that MOTHER was not a static joke token but a project with an active team building toward real commercial deliverables.

92.    That impression made the subsequent Unreal Mobile, MOTHERLAND, DreamVault, and market maker announcements more credible to consumers.

93.    MOTHER holders did not receive equity in any of Azalea's businesses. They received no revenue sharing rights, they had no voting control and no contractual claims on business performance.

16

94.     Therefore, the value of MOTHER depended primarily on expected future demand for the Token. Expected demand depended on whether MOTHER would have real-world use cases, commercial integrations generating recurring demand, and institutional market maker support providing liquidity and confidence.

95.     A reasonable consumer would consider these representations important to a purchase or holding decision: that MOTHER could be used to purchase phones and cell plans with savings of up to $600 per year; that a casino would be "powered by $MOTHER"; that a luxury marketplace would accept MOTHER as exclusive payment; and that two prominent market making firms were supporting the Token.

**D. The Utility Representations and Their Failures**

96.     In markets for consumer-facing financial products, announcements of material commercial integrations, payment functionality, or revenue-generating use cases affect consumer expectations about future demand.

97.     If the announced integration is temporary, aspirational, or never operational, the issuer has created an informational vacuum that injures those who relied on it.

98.     For MOTHER purchasers, each utility announcement functioned as the digital asset equivalent of a material business development disclosure. Purchasers relied on these announcements to distinguish MOTHER from pure speculation.

99.     Each failed or incomplete integration supports GBL Section 349, GBL Section 350, and negligent misrepresentation and the cumulative pattern of announcement followed by non-delivery supports the unjust enrichment claim.

100.    On June 9, 2024, Azalea announced on X: "Tomorrow I'm finally relaunching the telecommunication company I co-founded and you will be able to purchase phones, or month to month cell plans using $MOTHER or Sol."

101.    She disclosed the payment infrastructure partner: "Btw @sphere_labs are who we have utilized to incorporate the CT payment system launching tmrw with Unreal Mobiles relaunch."

102.    The following screenshot depicts the announcement:



*Exhibit B: Azalea's X post, June 9, 2024. Azalea announced that consumers could purchase phones and cell plans using $MOTHER through Unreal Mobile.*

103.    On June 11, 2024, Azalea posted: "The NEW Unreal Mobile site is live now & as promised in addition to standard $ payments we have added crypto (including $MOTHER of course) as a checkout option."

104.    On June 12, 2024, the @MOTHERprovides account published: "ICYMI: $MOTHER will be available on… @IGGYAZALEA's telecommunications company @UNREALMobile / Buy phones or pay your monthly phone bill with $MOTHER".

105.    The accompanying graphic stated: "SAVE UP TO $600/YEAR ON YOUR CELL PHONE BILL. PURCHASE PHONES, OR CELL PLANS USING $MOTHER OR SOL."

106.    Sphere Labs confirmed the partnership from its own account on June 4 and June 11, 2024, stating it had been "a blast working with @IGGYAZALEA and team to bring real world utility and new eyeballs to crypto."

107.    The Unreal Mobile account itself confirmed the integration and later offered consumer-facing promotions including "$50 off the iPhone 16 Pro when you pay with $MOTHER" (September 2024).

108.    On November 27, 2024, Unreal Mobile offered "up to $200 off select iPhone models" payable in $MOTHER.

109. Phone plans are recurring monthly consumer services. A token usable to pay phone bills suggests repeat transactional demand, not merely novelty utility. This was the single most important representation distinguishing MOTHER from ordinary memecoins.

110. It told consumers that MOTHER would be integrated into an actual operating business generating real revenue, and that every Unreal Mobile subscriber who paid with MOTHER would create recurring demand for the Token.

111. As of the date of this Complaint, no publicly observable evidence confirms that $MOTHER has been continuously integrated into the Unreal Mobile payment infrastructure as described.

112. The Unreal Mobile website does not currently reference $MOTHER. No announcement of a completed integration, cancellation, or explanation has been published. The "save up to $600/year" claim required substantiation that has not been provided.

113. Plaintiff alleges, in the alternative: the integration never worked as represented, making the representation false; the integration worked only briefly, making the representation misleading because consumers were not told it was temporary or dependent on third-party payment rails that might be discontinued; or the integration was announced to support token demand without a binding commitment to maintain it.

114. On June 7, 2024, the MOTHER team announced a merchandise store at mother.fun where branded goods could be purchased using $MOTHER tokens.

115. This was positioned as the first live utility layer and contributed to an 18% price rally at the time of announcement.

116. Merchandise utility made the broader utility narrative more believable. It gave consumers a concrete example of token use, but alone could not substantiate the broader narrative.

117. In September 2024, Azalea announced DreamVault, a luxury retail and gifting marketplace where $MOTHER would be the exclusive accepted payment method.

118. Azalea stated: "You may want to utilize it as a marketplace to purchase items for yourself (at a 10% discount with $MOTHER) we have luxury brands avail in every category you can imagine."

119. Brands named available included Hermes, Chanel, Yeezy, Nike, and Rolex. She described DreamVault as her self-described "idea baby" (sic), a project she had developed for over a year.

120. She announced a launch in approximately three weeks from her September 2024 announcement. DreamVault does not appear to have launched in the manner represented.

121. A luxury marketplace where MOTHER would be the exclusive payment method suggested that the Token would be required to access consumer goods and luxury transactions, creating future demand from an entirely new demographic of fashion and lifestyle consumers.

122. The 10% discount for MOTHER holders created a structural incentive to acquire and hold the Token in anticipation of the DreamVault launch. Consumers were not told whether the announced launch date or luxury-brand access were binding or merely aspirational.

123. In traditional finance, an issuer that announces a major commercial partnership with luxury brands, names those specific brands, sets a launch date, and then fails to deliver, has made a materially misleading forward-looking statement.

124. MOTHER was associated with entertainment and music-related utility. In September 2024, the Breakaway Nashville music festival announced $MOTHER as its official cryptocurrency payment.

125. Token holders would receive a 20% discount on festival passes. Azalea launched a "Mother Knows Best" podcast in July 2024 in collaboration with The Volume.

126. Azalea appeared at the Token2049 conference in Singapore in September 2024, where she hosted the "Motherland Rodeo" event.

20

127.  The available public record shows limited or isolated entertainment integrations rather than a durable ecosystem adoption.

128.  If these were one-off or limited promotions, that limitation was material and should have been disclosed.

### E. The MOTHERLAND Casino

129.  For a digital token promoted as having real-world utility, an announcement that the token will power a revenue-generating business goes directly to expected transaction volume and demand.

130.  If the issuer's own casino or business then launches using a different payment system entirely, the original representation was either false at inception or abandoned without notice.

131.  For MOTHER purchasers, the MOTHERLAND casino was the single most concrete, verifiable promise that the Token would have real commercial utility. Its failure is the cleanest promise-versus-reality fact in this case.

132.  The legal significance is unambiguous; this fact supports every cause of action. Azalea publicly stated that she owned a casino and was uniquely positioned to know whether MOTHERLAND would use MOTHER or USDT as its operational wagering and settlement currency.

133.  On August 21, 2024, Azalea posted a graphic captioned "Welcome to MOTHERLAND", the first public reference to what was subsequently revealed to be an online casino.

134.  This announcement came approximately three months after the initial Token launch and two months after the Token's price peaked, during a period of sustained price decline.

135.  On September 12, 2024, Azalea posted: "I hope you held on to your $MOTHER / You'll need it to get into MOTHERLAND."

136.  This was a direct purchase-and-hold inducement. It told consumers that possession of MOTHER would be necessary for access to a new commercial platform.

137. On September 20, 2024, in connection with the Motherland Rodeo event in Singapore, Azalea posted on X: "I like crypto and I own a casino".

138. She described the platform in detail: "It has sexxy ass girls that you can chat to while you play. The live dealers are also hotties. You can wager against friends."

139. She stated: "I'm creating a newer better version of the traditional online casino model." She further stated that the product she was building was "a first mover in the genre" and "very on brand and cohesive for the $MOTHER token to integrate into."

140. The @MOTHERprovides account announced: "Excited to officially announce Motherland, a new online casino. Motherland is releasing in November and will be powered by $MOTHER."

141. Casino wagering generates continuous high-frequency transactions. A token required for casino deposits, wagers, and access could generate significant daily transactional demand.

142. The representation that MOTHERLAND would be "powered by $MOTHER" told consumers the Token would have a defined, necessary role in a revenue-generating business. The representation that holders would "need it" told consumers that token ownership was a prerequisite for platform access.

143. When a promoter announces that a token will serve as payment infrastructure for a gaming or entertainment platform, consumers reasonably assess the expected transaction volume and price impact of that promised use case.

144. Here, the casino promise created the expectation of daily, high-frequency demand for MOTHER tokens, a volume driver that could, if real, have justified sustained market interest well beyond the initial promotional period.

145. On or about January 19, 2025, the MOTHERLAND casino launched at mother.land, operated by MIBS N.V. under the laws of Curaçao, under the @PlayMotherland account. Although MOTHER is publicly listed among accepted deposit currencies, the casino's

wagering, bonus accounting, and settlement are denominated in USDT (Tether), not in $MOTHER tokens.

146. This directly contradicts the core September 2024 representation that MOTHERLAND would be "powered by $MOTHER."

147. This is not a minor implementation detail. It eliminates the promised transactional demand for the Token. Token holders who purchased or held $MOTHER based on the MOTHERLAND integration promise received no utility from the casino.

148. The value driver that was most specifically and directly promised did not materialize: MOTHER is not the token powering the casino. MOTHERLAND's gaming, wagering, and bonus operations run on USDT, with $MOTHER's role limited to one of many accepted deposit currencies and a periodic cashback paid to holders.

149. Meanwhile, Azalea and the MOTHERLAND enterprise continued to extract value from the MOTHER community. In May 2025, Azalea conducted a pump.fun livestream in which $MOTHER tokens were given away in connection with casino engagement.

150. The @PlayMotherland account actively promoted the casino to the MOTHER community, including deposit bonuses and free spin promotions. The casino acquired customers using the brand and community built during the MOTHER promotional campaign.

151. Those customers came from an infrastructure built with retail purchasers' attention and capital. The casino extracted commercial value from the MOTHER ecosystem while providing no functional utility to token holders.

**F. Market Maker Selection and the Price Support Narrative**

152. In markets for financial products, the selection of institutional liquidity providers, market makers, or similar partners can convey credibility and affect consumer perceptions of price stability, liquidity, and legitimacy.

153. When the terms of those arrangements are not disclosed, including whether the market maker can short, hedge, or lend the asset, investors are exposed to a market that may appear more organic and stable than it actually is.

154. For MOTHER purchasers, the Wintermute and DWF Labs announcements functioned as institutional endorsements. The DWF Labs announcement alone caused a 50% intraday price surge, confirming that the market treated these disclosures as material.

155. The omission of the terms and risks of these arrangements is independently actionable under GBL Section 349 and supports the negligent misrepresentation claim because only the Defendants knew the arrangement terms.

156. Azalea's engagement with professional market makers is one of the clearest indicators that she understood and intentionally acted to support MOTHER's price, liquidity, and exchange credibility.



*Exhibit C-1: Unchained Crypto podcast promotional graphic, July 2024. Episode titled "Iggy Azalea's Crypto Ambitions," featuring the MOTHER token logo and Solana blockchain logo.*



**Iggy Azalea on Memes, OnlyFans, and Her Plans to Make MOTHER a Success**

*Exhibit C-2: Unchained Crypto podcast interview screenshot, July 2024. Laura Shin interviews Azalea, who is identified as "Mother of $MOTHER." Episode titled "Iggy Azalea on Memes, OnlyFans, and Her Plans to Make MOTHER a Success."*



*Exhibit C-3: CoinDesk / Unchained Crypto podcast page, July 2024. Azalea discussed market maker selection, exchange strategy, token inventory transfer, and MOTHER's future.*

157.    On or around June 19-21, 2024, Azalea announced a partnership with Wintermute Trading Ltd. The @MOTHERprovides account published an image-based post with the text "WINTERMUTE IS COMING." Azalea posted: "Today's the day it finally starts."

158.    This announcement was made at or near the Token's all-time high price. On July 11, 2024, DWF Labs, a prominent cryptocurrency trading and investment firm, announced a "strategic partnership" with Azalea.

159.    The MOTHER token surged over 50% intraday following the DWF Labs announcement. CoinDesk reported the partnership and the price movement. The market treated institutional market maker support as a material, price moving event.

160.    On July 10, 2024, Azalea admitted on X: "We have 2 top tier market makers working with us now / We're in conversations with multiple exchanges."

161.    In her July 2024 Unchained Crypto interview, Azalea provided detailed explanations of her market maker strategy that are directly relevant to knowledge, intent, and the nature of the deception. She explained that she chose Wintermute so that exchanges considering $MOTHER would be reassured of the project's legitimacy by the involvement of a respected market maker, particularly because she launched MOTHER amid a wave of celebrity-token scams. She explained that she chose DWF Labs to expand $MOTHER into the Asian cryptocurrency market. As reported by CoinDesk on July 11, 2024, Azalea "loaned her entire MOTHER token holdings to DWF Labs and Wintermute."

162.    Consumers were not told the full terms of the market maker arrangements nor were they told whether market makers could sell, short, hedge, borrow, lend, or otherwise trade MOTHER in ways adverse to retail purchasers.

163.    Consumers were not told whether market maker activity was intended to stabilize price, create liquidity, support exchange listings, or improve price optics. They were not told whether insiders could sell into market maker-supported liquidity.

164. Consumers were therefore exposed to a market that may have appeared more organic, stable, and legitimate than it actually was.

165. Azalea's stated reasons for choosing her market makers demonstrates that she understood price, liquidity, exchange confidence, and market perception were central to MOTHER's value.

166. She selected Wintermute specifically to reassure exchanges that were wary of celebrity token projects. She knew that exchange listings drove retail access and trading volume, and that Wintermute's name would function as a credibility signal.

167. She selected DWF Labs specifically to expand MOTHER's reach into Asian cryptocurrency markets, where trading volume could materially increase demand for the Token.

168. She transferred her personal token holdings to both firms, a decision that gave market makers the inventory they needed to provide liquidity and execute trades on exchanges across multiple jurisdictions.

169. In any market where a promoter transfers substantial token inventory to professional trading firms, the terms and risks of those arrangements are material to consumers because they affect supply, liquidity, trading incentives, and potential conflicts.

170. These are not the acts of a passive celebrity endorser. They are the deliberate acts of someone engineering the market conditions that would make MOTHER appear credible, liquid, and institutionally supported to retail purchasers.

## G. The Admission Against Interest, Continuing Representations, and Unified Course of Conduct

171. In deception cases, a promoter's later statement that contradicts earlier promotional representations can serve as circumstantial evidence that the original representations were misleading.

172. Azalea's October 2024 admission that the promised integrations were "not utility" but "just perks" functions as exactly that kind of contradictory statement.

27

173. For purchasers, this admission retroactively recharacterized the entire utility narrative. It told them that the phone plan integration, casino access, luxury marketplace, and other represented use cases were never the value drivers they were described as.

174. That admission, combined with the continuing Thrust migration representations, supports an inference of a unified course of conduct designed to build and preserve token value through a rolling series of promotional claims.

175. On October 11, 2024, in a reply to the X user @SolJakey, Azalea explicitly stated: "It's not utility they're just perks of holding $MOTHER."

176. Azalea had previously used utility-based representations to build token value. She announced that MOTHER could be used for phone plans, casino access, luxury retail, event tickets, and merchandise.

177. She framed these integrations as reasons MOTHER had value beyond speculation. When challenged, she recharacterized those same integrations as non-utility "perks."

178. This contradiction supports the inference that the utility narrative was overstated or opportunistic and only deployed when it served promotional purposes and disclaimed when it created accountability.

179. In November 2025, Azalea announced that she had joined Thrust, a Solana based creator token launchpad, as Creative Director. Reports indicated a planned migration of $MOTHER to the Thrust platform.

180. Azalea stated: "I've sort of been sitting dormant trying to figure out how can I create some sort of real revenue to put back into what we're doing."

181. No new $MOTHER contract address or token swap has been confirmed as of the date of this Complaint.

182. After sustained price decline and failed utility delivery, migration statements reassure holders that the project is still being developed. If no migration occurred, the representation extends the period during which consumers remained invested in a declining asset.

183. This Complaint does not rest on any single misstatement. The alleged deception was a course of conduct, a series of economically coherent acts designed to create and preserve the impression that MOTHER was a utility-backed, commercially integrated, and professionally supported digital asset.

184. Azalea and project-affiliated actors distinguished MOTHER from scam celebrity tokens, used Azalea's personal brand to authenticate the Token, and promoted MOTHER to retail consumers through social media, interviews, NYSE appearances, and public events.

185. They announced real-world utility through Unreal Mobile, tied the Token to merchandise, DreamVault, entertainment experiences, and promised that MOTHERLAND would be "powered by $MOTHER."

186. They selected professional market makers, publicly announced those relationships, provided token inventory to market makers, and encouraged consumers to view MOTHER as supported, liquid, and still developing.

187. Each act served the same economic purpose: increasing or preserving MOTHER's perceived value. Together, they supported the market price and induced consumers to buy or hold.

## H. The Representations and Their Outcomes

188. The pattern of representation followed by non-delivery can be summarized across seven categories, each of which independently supports the claims asserted herein.

189. Unreal Mobile was represented as a telecom integration where MOTHER could be used for phone plans and handsets with savings of up to $600 per year. The consumer meaning was clear: recurring real-world demand distinguishing MOTHER from speculative memecoins.

190. No publicly verified durable payment integration has been confirmed. No explanation for discontinuation has been published. Consumers bought into a recurring utility story that did not materialize as represented.

191.   The MOTHER merchandise store was represented as a functioning consumer marketplace where branded goods could be purchased using $MOTHER tokens. This was the first live utility layer announced after launch.

192.   Merchandise alone could not support the broader ecosystem narrative. Its primary significance is that partial delivery of a single use case was used to make broader, undelivered promises more credible to consumers evaluating the project.

193.   DreamVault was represented as a luxury gifting marketplace where MOTHER would be the exclusive payment method with a 10% discount for holders. Brands including Hermes, Chanel, Nike, and Rolex were named as available.

194.   No verified public launch of DreamVault has been confirmed. Consumers were not told whether the announced launch date or luxury brand access claims were binding, operational, or aspirational.

195.   Entertainment and event ticketing integrations were represented through the Breakaway Nashville festival partnership and the Token2049 Motherland Rodeo event. A "Mother Knows Best" podcast was launched through The Volume.

196.   The available public record shows limited or isolated entertainment integrations rather than a cohesive ecosystem adoption. Consumers were not told whether these were temporary marketing events or part of a sustained commercial network.

197.   MOTHERLAND was represented as a casino "powered by $MOTHER" where token holders would "need it to get into MOTHERLAND." Casino wagering generates continuous high frequency transactions.

198.   The casino launched with USDT, not $MOTHER, as the operational settlement and wagering currency, despite the September 2024 representation that it would be "powered by $MOTHER." The core represented use case was eliminated. Commercial brand value was extracted from the MOTHER community while functional token utility was absent.

199. The Thrust migration was represented as a technical upgrade and revenue generation initiative. After months of sustained price decline and failed utility delivery, migration statements reassured holders that the project was still being actively developed.

200. No confirmed migration has occurred. The representation supported a continuing course of conduct designed to maintain holder confidence during a period of declining asset value.

201. The market maker partnerships were represented or implied as providing professional liquidity, stability, and institutional support from Wintermute and DWF Labs. The DWF Labs announcement caused a 50% intraday price surge.

202. The terms of these arrangements, including trading authority, hedging rights, adverse trading, and insider monetization opportunities were never disclosed. Consumers traded in a market whose support structure was not fully transparent.

## I. Causation, Consumer Harm, and Defendants' Knowledge

203. In markets for publicly traded digital financial products, consumers are harmed when they purchase at prices inflated by material misrepresentations and when later events reveal that the represented utility, demand drivers, or market support did not exist as promoted.

204. The same framework applies here. MOTHER's price incorporated the market's assessment of the represented utility, integrations, and institutional support. When those value drivers failed to materialize, the price collapsed.

205. For purchasers, the primary harm was overpayment: they paid more for MOTHER than they otherwise would have paid absent Azalea's utility, integration, and market-support representations. Continuing representations about MOTHERLAND, DreamVault, and the Thrust migration also induced consumers to hold MOTHER when they otherwise would have sold.

206. This establishes the causal link between Defendants' conduct and consumer loss required for each cause of action.

207.    The harm alleged in this Complaint is not mere disappointment that a speculative asset declined. It is overpayment and inflated price injury caused by material misrepresentations and omissions.

208.    MOTHER reached an all-time high market capitalization of approximately $200 million on or about June 6, 2024. That valuation incorporated the market's assessment of the represented utility, commercial integrations, and institutional market maker support.

209.    Consumers paid more for MOTHER than they would have paid absent those representations. Consumers were also induced to hold MOTHER when they otherwise would have sold.

210.    Representations about MOTHERLAND being "powered by $MOTHER", DreamVault launching in three weeks, continuing exchange negotiations, and the Thrust migration, all encouraged holders to maintain their positions.

211.    The represented ecosystem did not materialize in a durable, meaningful, or value supportive way. The Unreal Mobile integration is not publicly visible. The MOTHERLAND casino operates on USDT. DreamVault did not launch.

212.    Entertainment integrations were limited. The market maker arrangements did not prevent the Token from collapsing. As of the date of this Complaint, the Token has declined approximately 99.5% from its all-time high, from approximately $0.24 to approximately $0.001.

213.    Azalea and affiliated entities benefited from consumer participation. Azalea received brand promotion, commercial traffic for businesses tied to the MOTHER narrative, media attention, and increased visibility for enterprises associated with the MOTHER brand.

214.    Unreal Mobile and MOTHERLAND, though not presently named as Defendants, received promotional value, customer attention, and commercial traffic from the MOTHER utility narrative. Doe Defendants, including unknown affiliated wallet holders, promoters, market participants, and project-account operators, also benefited from token allocations, trading opportunities, or promotional compensation. Retail purchasers bore the losses.

215. Azalea and Doe Defendants had superior knowledge about every material fact at issue. Azalea publicly claimed substantial ownership of Unreal Mobile and a casino.

216. She knew whether the payment integration was real, stable, or temporary. She knew whether MOTHERLAND would use MOTHER or USDT. She knew whether DreamVault would launch.

217. She selected the market makers, transferred tokens to them, and understood the purpose of those arrangements. Consumers, by contrast, could not independently verify any of these facts.

218. Consumers could not inspect the terms of market maker agreements or confirm whether the Unreal Mobile integration was operational. They could not assess whether trading activity reflected organic demand or market maker-supported liquidity.

219. The informational asymmetry was profound and structural. Azalea and Doe Defendants controlled the information that determined whether consumers' investment had value, and they chose what to disclose and what to withhold..

# V. CLASS ALLEGATIONS

220.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who purchased or otherwise acquired MOTHER tokens for value during the period from May 28, 2024 through the date of the filing of this Complaint and who suffered losses as a result of the conduct alleged herein. Plaintiff reserves the right to seek certification of a New York subclass, state-law subclasses, or other appropriate subclasses based on facts developed in discovery, including subclasses of purchasers whose transactions occurred in New York, who were exposed to deceptive conduct in New York, or whose transactions arose from Azalea's New York-centered promotional campaign.

> *All persons and entities who purchased or otherwise acquired MOTHER tokens for value during the period from May 28, 2024 through the date of the filing of this Complaint (the "Class Period") and who suffered losses as a result of Defendants' conduct described herein (the "Class").*

221.    Excluded from the Class are Azalea, Doe Defendants once identified, their officers, directors, agents, employees, immediate family members, and any entity in which any Defendant has a controlling interest.

222.    Also excluded are institutional market makers who acted in that capacity, persons bound by enforceable arbitration agreements with Defendants covering these claims, and any judge assigned to this action.

223.    Plaintiff reserves the right to amend the Class definition based on information obtained in discovery.

**Numerosity (Rule 23(a)(1)), Commonality (Rule 23(a)(2)), Typicality (Rule 23(a)(3)), and Adequacy (Rule 23(a)(4))**

224.    The Class is so numerous that joinder of all members is impracticable.

225. On-chain data reflects numerous unique wallet addresses that held or traded MOTHER during the Class Period. Many held tokens through centralized exchanges or across multiple wallets.

226. Common questions of law and fact predominate, including whether Azalea and Doe Defendants engaged in deceptive acts or practices in violation of GBL Section 349, whether Azalea and Doe Defendants engaged in false advertising in violation of GBL Section 350, whether Azalea's and Doe Defendants' representations were materially misleading, whether Azalea and Doe Defendants were unjustly enriched, and the proper measure of damages.

227. Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members purchased the same Token, were exposed to the same or substantially similar public promotional campaign, and suffered the same types of injury.

228. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are not antagonistic to or in conflict with the interests of the Class. Plaintiff has retained counsel experienced in class action litigation and consumer protection matters, who will vigorously prosecute this action on behalf of the Class.

**Predominance and Superiority (Rule 23(b)(3))**

229. Common questions of law and fact predominate over individual Class members' questions. Azalea's representations were made publicly through market-facing channels, including social media, project-affiliated accounts, interviews, public appearances, and cryptocurrency media. The Token mechanics and promotional campaign affected purchasers on a common basis.

230. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the large number of Class members makes individual joinder impracticable and individual damages for many Class members may be relatively small, making individual prosecution economically infeasible.

35

# VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349

*(Against Azalea and Doe Defendants, on Behalf of the Class)*

231. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

232. New York General Business Law Section 349 declares that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

233. Azalea and Doe Defendants engaged in consumer-oriented deceptive practices by marketing MOTHER as a utility-backed, commercially integrated, professionally supported token while omitting material facts about the limitations of its utility and market support.

234. Azalea represented that MOTHER could be used to purchase phones and cell plans through Unreal Mobile with savings of up to $600 per year when no durable public payment integration has been confirmed. Azalea and project-affiliated Doe Defendants represented MOTHERLAND would be "powered by $MOTHER" when in actuality the casino does not function on MOTHER as the operational settlement currency.

235. Azalea represented that DreamVault would accept MOTHER as exclusive payment for luxury goods when DreamVault did not launch as represented. Azalea announced market-maker partnerships as proof of institutional support while failing to disclose the terms and risks.

236. Azalea and Doe Defendants concealed material information regarding insider holdings, early wallet allocations, the absence of any formal tokenomics disclosure, and the terms under which market makers could trade MOTHER in ways adverse to retail purchasers.

237. Azalea's and Doe Defendants' deceptive conduct was consumer-oriented. The Token was marketed and sold to consumers through social media, interviews, public appearances at the New York Stock Exchange, cryptocurrency media, project-affiliated channels including the @MOTHERprovides Telegram channel, and trading platforms.

238. The MOTHER token was marketed and sold to consumers for use in consumer transactions, including the purchase of cellular phone service, casino entry and gameplay, luxury goods at an announced 10% discount, and live music festival tickets. Plaintiff and the Class are therefore consumers of integrated goods and services, not merely investors in a speculative instrument, and the conduct alleged is consumer-oriented within the meaning of GBL § 349.

239. The challenged conduct occurred in New York or had a substantial New York nexus because Azalea used New York's financial-market institutions, including the New York Stock Exchange and Wall Street imagery, as part of the consumer-facing promotional campaign that generated demand for MOTHER. In the context of a decentralized digital financial product, the relevant deceptive transaction includes not only the on-chain purchase, but also the New York-centered market signaling and promotional conduct that induced consumers to purchase or hold the Token.

240. Azalea's and Doe Defendants' deceptive acts were material. MOTHER holders had no equity, revenue rights, or contractual claims. The Token's value depended on expected future demand, and Azalea's representations targeted the precise value drivers that determined that demand.

241. As a direct and proximate result of these deceptive acts, Plaintiff and the Class suffered overpayment and inflated-price injury. They paid more for MOTHER than they otherwise would have paid absent the utility, integration, and market-support narrative. Continuing representations also induced holders to maintain positions longer than they otherwise would have.

242. Azalea's and Doe Defendants' violations were willful and knowing. Azalea publicly claimed substantial ownership of the businesses at the center of the utility narrative,

personally selected market makers, and later admitted on October 11, 2024 that the represented integrations were "not utility" but "just perks of holding $MOTHER."

243. Pursuant to N.Y. GBL Section 349(h), Plaintiff seeks actual damages or fifty dollars, whichever is greater, treble damages up to one thousand dollars upon a showing of willful or knowing violation, reasonable attorney's fees, and injunctive relief.

**SECOND CLAIM FOR RELIEF**

**FALSE ADVERTISING IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 350**

*(Against Azalea and Doe Defendants, on Behalf of the Class)*

244. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

245. New York General Business Law Section 350 declares that "[f]alse advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful."

246. Azalea and Doe Defendants engaged in false advertising by disseminating specific, materially misleading statements through Azalea's X account, project-affiliated accounts (including the @MOTHERprovides Telegram channel and X account), media interviews, cryptocurrency media outlets, and promotional graphics, including statements amplified through project-affiliated and business-affiliated accounts.

247. Those statements included: "you will be able to purchase phones, or month to month cell plans using $MOTHER"; "SAVE UP TO $600/YEAR ON YOUR CELL PHONE BILL"; DreamVault would accept MOTHER as exclusive payment; "Motherland is releasing in November and will be powered by $MOTHER"; and "We have 2 top tier market makers working with us now."

248. These were not vague aspirational statements or puffery. They were specific operational claims about concrete commercial capabilities made to consumer audiences through

38

promotional channels. They were misleading in a material respect and had the capacity to deceive consumers.

249.    Plaintiff and the Class purchased tokens at prices inflated by these advertising statements and/or held tokens in reliance on the continued utility narrative.

250.    Pursuant to N.Y. GBL Section 350-e(3), Plaintiff seeks actual damages or five hundred dollars, whichever is greater, with discretionary increase up to ten thousand dollars upon a finding of willful or knowing violation, plus reasonable attorney's fees.

## THIRD CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION

*(Against Azalea and Doe Defendants, on Behalf of the Class)*

251.    Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

252.    Azalea and Doe Defendants made representations of material fact concerning the utility, commercial integrations, market support, and prospects of $MOTHER as described above.

253.    Under New York law, a duty to provide accurate information arises where a defendant possesses unique or specialized knowledge, where the relationship between the parties suggests a closer degree of trust than that of an ordinary buyer and seller, or where the defendant's representations are addressed to a particular class of persons rather than the general public. See Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996); Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 180 (2011). Azalea had a duty to provide accurate information because she possessed unique and superior knowledge concerning the operational status of the utility integrations she promoted, including Unreal Mobile, MOTHERLAND, DreamVault, and the market-maker arrangements.

254.    Azalea publicly claimed a substantial ownership interest in the telecommunications company used to promote MOTHER's payment utility and publicly stated that she owned

a casino. She personally selected market makers, transferred token inventory, and promoted utility integrations that consumers could not independently verify.

255. She personally selected market makers, negotiated the terms, and transferred token inventory. She knew the status of DreamVault development and entertainment partnerships.

256. These were specific operational claims within Azalea's and Doe Defendants' superior knowledge, not matters of public opinion or mere puffery.

257. Azalea and Doe Defendants made these representations without reasonable grounds for believing them to be true, or with knowledge that they were incomplete or misleading. They knew or should have known whether the Unreal Mobile integration was durable and whether MOTHERLAND would use MOTHER or USDT.

258. Having chosen to speak about MOTHER's utility, access rights, commercial integrations, and market support, Azalea and Doe Defendants were required to speak accurately and completely about matters uniquely within their knowledge.

259. Plaintiff and the Class justifiably relied upon Azalea's and Doe Defendants' misrepresentations. The statements concerned information to which only Azalea and Doe Defendants had access. Consumers could not visit Unreal Mobile's backend, review market-maker contracts, or inspect MOTHERLAND's architecture.

260. As a direct and proximate result, Plaintiff and the Class suffered financial losses in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

*(Against Azalea and Doe Defendants, on Behalf of the Class)*

261. Plaintiff re-alleges and incorporates by reference each allegation set forth above. This claim is pleaded in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

262. Azalea and Doe Defendants were unjustly enriched at the expense of Plaintiff and the Class. The MOTHER promotional campaign generated consumer demand, market liquidity, brand attention, customer acquisition, and commercial opportunities that Azalea and affiliated persons or entities captured.

263. Azalea received increased brand value, media attention, and promotional capital from the MOTHER community's engagement with her brand and businesses.

264. Businesses tied to the MOTHER utility narrative, including Unreal Mobile, received customer attention, website traffic, and promotional value from the MOTHER integration announcements, even though Unreal Mobile is not presently named as a Defendant.

265. MOTHERLAND, though not presently named as a Defendant, acquired customers from the MOTHER community, using the brand and social-media infrastructure built during the Token promotion to solicit gambling deposits.

266. Doe Defendants, including unknown wallet holders, promoters, market participants, project-account operators, and persons or entities involved in market-maker arrangements, received token inventory, trading opportunities, promotional compensation, or other benefits.

267. Merchandise sales, event promotions, and podcast launches all leveraged the MOTHER community's attention. Plaintiff and the Class conferred these benefits by purchasing $MOTHER tokens for value.

268. Their capital and participation directly funded the market liquidity, brand attention, and commercial ecosystem from which Azalea and Doe Defendants profited. Consumers did not receive the durable utility or value supporting ecosystem they were led to expect.

269. The promised integrations were limited, incomplete, contradicted, or not delivered. Retention of benefits obtained through misleading promotion would be inequitable and unconscionable.

270. Plaintiff seeks restitution and disgorgement of all revenues, profits, and benefits wrongfully obtained, in an amount to be determined at trial.

## VII. PRAYER FOR RELIEF

271.    WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that this Court enter judgment against Azalea and Doe Defendants, jointly and severally, to the extent permitted by law, and grant the following relief:

(a) An order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), designating Plaintiff as Class Representative, and designating Plaintiff's counsel as Class Counsel;

(b) An order directing that reasonable notice be given to Class members pursuant to Fed. R. Civ. P. 23(c)(2)(B);

(c) An award of actual damages to Plaintiff and the Class, including out-of-pocket losses, overpayment damages, and the difference between the price paid and the actual value of the tokens at the time of purchase, in an amount to be proven at trial;

(d) An award of damages to Plaintiff and each Class member pursuant to N.Y. GBL Section 349(h), including actual damages or fifty dollars, whichever is greater, with discretionary trebling up to one thousand dollars upon a finding of willful or knowing violation;

(e) An award of damages to Plaintiff and each Class member pursuant to N.Y. GBL Section 350-e(3), including actual damages or five hundred dollars, whichever is greater, with discretionary increase up to ten thousand dollars upon a finding of willful or knowing violation, plus reasonable attorney's fees;

(f) An award of compensatory damages to Plaintiff and the Class for all losses proximately caused by Defendants' negligent misrepresentations, in an amount to be proven at trial;

(g) Restitution of money or property wrongfully obtained from Plaintiff and the Class, including traceable proceeds received by Defendants through the unlawful conduct alleged herein, in amounts to be proven at trial;

(h) Imposition of a constructive trust over specifically identifiable assets traceable to the conduct alleged herein, including any Defendant-controlled digital assets, token reserves, insider allocations, or proceeds wrongfully obtained through the conduct alleged herein;

(i) A preliminary and permanent injunction, as appropriate, restraining Defendants from transferring, dissipating, encumbering, or otherwise disposing of specifically identifiable assets traceable to the conduct described herein;

(j) An award of reasonable attorney's fees and costs pursuant to N.Y. GBL Section 349(h) and as otherwise permitted by law, including costs of notice to the Class;

(k) An award of prejudgment interest to Plaintiff and Class members at the statutory rate from the date of each wrongful act through the date of judgment; and

(l) Such other and further relief as this Court deems just, proper, and equitable.

## VIII. JURY DEMAND

272.    Plaintiff, on behalf of himself and all Class members, hereby demands a trial by jury on all issues so triable.

Dated: May 4, 2026

New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**

By: /s/ Max Burwick

43

Max Burwick, Esq.

One World Trade Center, 84th Floor

New York, NY 10007

Tel: (646) 762-1080

max@burwick.law

*Counsel for Plaintiff and the Proposed Class*